## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DEAN CAMPBELL and
D C COMPASS DUNDEE, L.L.C.,

        Plaintiffs,

        v.                           Case No.  04-4108-JWL

BANK OF AMERICA, N.A., PRIVATE
BANK, REAL ESTATE ADVISORY
SERVICES,

        Defendant/Third-Party Plaintiff,

        v.

JOHN TERZAKIS, et al.,

        Third-Party Defendants.

_____

### MEMORANDUM AND ORDER

This lawsuit arises out of a § 1031 like-kind exchange real estate investment.  Plaintiff Dean Campbell sold commercial property located in Manhattan, Kansas, and through his wholly owned entity D C Compass Dundee, L.L.C. he purchased an exchange property located in Illinois.  The real estate investment in Illinois went awry and plaintiffs sued defendant Bank of America, N.A. for its role in advising and assisting Mr. Campbell with selecting exchange properties.  The bank, in turn, filed a third-party complaint seeking indemnity from those entities that the bank believes own and control the Illinois property.  This matter comes before the court on the motions of third-party defendants CenterPoint Property Trust (doc. 66) and

Urban Investment Trust, Inc. and related individuals and entities (doc. 77) to dismiss the bank's amended third-party complaint for lack of personal jurisdiction.  As explained below, the court finds that these motions should be granted because the bank has not established that the exercise of jurisdiction over these third-party defendants would comport with principles of due process under the facts and circumstances of this case.  The court will therefore dismiss the bank's indemnity claims against these third-party defendants for lack of personal jurisdiction.

## FACTUAL BACKGROUND

The following facts are set forth according to the standard for evaluating a motion to dismiss for lack of personal jurisdiction.  When a motion to dismiss for lack of personal jurisdiction is decided prior to trial on the basis of affidavits and other written materials, the court must accept the allegations in plaintiff's complaint as true to the extent they are uncontroverted by defendant's affidavits.  *Behagen v. Amateur Basketball Ass'n of the United States*, 744 F.2d 731, 733 (10th Cir. 1984).  If the parties present conflicting affidavits, the court resolves all factual disputes in favor of the plaintiff.  *Id.*  In this case, then, the following facts consist of those contained in plaintiffs' complaint and the bank's first amended third-party complaint as well as the facts contained in affidavits and other written materials submitted to the court, as viewed in the light most favorable to the bank.

Plaintiff Dean Campbell is an Arizona resident.  He owned a Budweiser distributorship in Manhattan, Kansas, from 1968 to 2000.  In 2000, he sold the distributorship and some of the commercial property upon which it was located.  He contacted the bank to seek assistance

2

with minimizing his tax obligations resulting from the sale of the commercial property.   The bank recommended that he pursue a like-kind exchange under § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031.   Mr. Campbell and the bank entered into an advisory agreement pursuant to which the bank was to assist Mr. Campbell with finding, evaluating, investigating, negotiating, and closing the purchase of one or more replacement properties.

Mr. Campbell contends that the bank failed to use its best efforts in this endeavor.   Time was of the essence because I.R.C. § 1031 requires the replacement property to be identified within forty-five days of the closing of the sale of the original property.   As a result of time constraints, the bank recommended a short-term investment program offered by third-party defendant Tax Deferred Services, L.L.C. (TDS).   This program offered a money back guarantee through the use of a "put option" whereby Mr. Campbell could invest in a multiple-owner building with the ability to have his investment returned in one year.   Based on the bank's recommendation, Mr. Campbell decided to invest in the program.

Mr. Campbell abided by the instructions he received from TDS and formed plaintiff D C Compass Dundee, L.L.C. (DC Compass) to acquire the property.   DC Compass is an Illinois limited liability company with its principal place of business in Manhattan, Kansas.   Mr. Campbell is the only member, owner, and manager of DC Compass.   The purchase ultimately consisted of DC Compass purchasing a 2.85% interest in commercial property located in Arlington Heights, Illinois, which is commonly known as the Honeywell property, from third-party defendant Dundee 53, L.L.C. (Dundee 53).   The transaction was accomplished pursuant to a Purchase and Sale Agreement between Dundee 53, as seller, and DC Compass, as buyer.

3

Third-party defendant John D. Terzakis executed the agreement on behalf of Owner Dundee 53, Inc. as manager of Dundee 53.   Mr. Terzakis executed the agreement in Chicago.   The agreement contains an Illinois choice of law provision.   DC Compass's purchase of the Honeywell property completed the § 1031 tax deferred transaction.

Approximately a year later, DC Compass issued a "put notice" and requested that Dundee 53 re-purchase DC Compass's interest in the Honeywell property as required by their agreement.   Dundee 53 did not, however, comply with its obligation to re-purchase DC Compass's interest in the building.   Plaintiffs allege that the principals affiliated with Dundee 53 and/or other related or affiliated entities have withheld or absconded with the funds necessary to repay DC Compass.   Plaintiffs claim that they have incurred attorney fees and lost money on the investment as a result of Dundee 53's failure to re-purchase its interest in the Honeywell property once plaintiffs exercised the put option.

Plaintiffs filed this action against the bank alleging that the bank breached its duties under the advisory agreement.   Plaintiffs allege that the bank, among other things, failed to use its best efforts to locate properties available for purchase and failed to use its best efforts to investigate the soundness of the investment.   The bank is a Delaware corporation with its principal place of business in North Carolina.

The bank, in turn, filed a third-party complaint against the individuals and entities which it believes own and control the Honeywell property.   The amended third-party complaint alleges that to the extent the bank is or may be liable to plaintiffs, the third-party defendants are liable to the bank in indemnity.   The bank alleges that Dundee 53 and the other third-party

4

defendants have fraudulently and illegally withheld or absconded with the funds owed to plaintiffs, and that they have engaged in breaches of and defaults under the lease agreements for the Honeywell property, gross mismanagement of the property, conversion of plaintiff's funds, and fraud and negligence in misrepresenting the fractional interest purchase arrangement to plaintiffs. The bank contends that "[e]quity compels" that the third-party defendants be held liable to the bank for their wrongful acts or omissions. The third-party defendants who now seek dismissal on the grounds of a lack of personal jurisdiction include the following individuals and entities.[1]

CenterPoint Properties Trust (CenterPoint) was the prior owner of the Honeywell property. CenterPoint sold the property to Dundee 53 approximately one month before DC Compass purchased its interest in the property from Dundee 53. CenterPoint is a real estate investment trust incorporated in Maryland with its principal place of business in Illinois. Its business is focused on industrial real estate in the Chicago area. CenterPoint develops multi-facility industrial parks located near highways, airports, and railroads. Its target market is comprised of an area within a one hundred fifty mile radius of Chicago. CenterPoint's investment portfolio consists of properties that are located for the most part in Illinois with a few properties in Indiana, Wisconsin, and Ohio. CenterPoint does not have any employees, agents, or other contacts with Kansas. It does not own or lease property in Kansas. It does not have an authorized agent for service of process in Kansas. It is not registered with the Kansas

---

[1] The other third-party defendants not mentioned include Rudy Mulder and Thomas P. Lowery & Associates, Ltd.

Secretary of State as a foreign corporation.  It has never bought or sold real estate or interests in real estate in Kansas.  And, an affidavit submitted by CenterPoint's general counsel states that CenterPoint never communicated with the bank or plaintiffs about the Honeywell property. The affidavit explains that after CenterPoint sold the property to Dundee 53, CenterPoint no longer held any interest in the property.  It did not receive any funds from Dundee 53 as a result of Dundee 53's sale of any interest in the property to other investors such as DC Compass. CenterPoint does not and has never had any right, title, or interest in the other corporate third-party defendants, and it never authorized the individual third-party defendants to act on its behalf.

John Terzakis and Roxanne Gardner are Illinois residents.  Mr. Terzakis and Ms. Gardner have submitted affidavits in which they state that they have never conducted business in Kansas.  They have never, as individuals, entered into any contracts with Kansas residents. They have never owned or leased real or personal property in Kansas.  They have never paid or been asked to pay Kansas taxes.  Mr. Terzakis' affidavit states that he has never had a business relationship in Kansas with the bank.  Ms. Gardner's affidavit states that she has never had a business relationship with plaintiffs or the bank.

Mr. Terzakis is the president of third-party defendant Urban Investment Trust, Inc. (Urban Investment Trust) which is the managing member of TDS.[2]  Mr. Terzakis is also the president of third-party defendant Manager Dundee 53, Inc. (Manager Dundee 53), which is the

---

[2] On November 1, 2001, Ms. Gardner resigned her positions with third-party defendants Urban Investment Trust, Dundee 53, Master Dundee 53, Manager Dundee 53, and TDS.

6

managing member of third-party defendants Dundee 53 and Master Dundee 53, LLC (Master Dundee 53).   With the exception of Master Dundee 53, all of these entities are Illinois companies with their principal places of business in Illinois.   Master Dundee 53 is a Delaware limited liability company with its principal place of business in Illinois.   The affidavits submitted by Mr. Terzakis and Ms. Gardner state that, to the best of their knowledge, none of these corporate entities has or had an office or branch location in Kansas; they do not have employees, agents, or representatives in Kansas; they have not owned or leased property in Kansas; they have never been registered with the Kansas Secretary of State as foreign corporations; they have not done business with any distributors, suppliers, or retailers in Kansas; they have not paid Kansas taxes; and no employees or representatives of any of these entities has ever traveled to Kansas to meet with employees or representatives of the bank.

The bank's complaint alleges that Dundee, Inc. and Dundee 53, Inc. are both Illinois corporations with their principal places of business in Illinois.   Mr. Terzakis' affidavit states that to the best of his knowledge these entities do not and have never existed.   He believes that the bank erred in naming them as third-party defendants.

In an attempt to support this court's exercise of personal jurisdiction over these third-party defendants, the bank primarily relies on the allegations contained in a verified complaint in another lawsuit pending in Chicago.[3]   That lawsuit was brought by approximately two dozen

---

[3] The court certainly acknowledges the third-party defendants' various objections (which may be valid to some extent) to the bank's reliance on this verified complaint.  But, for reasons explained later, even if the court considers these allegations in resolving the third-party defendants' motions to dismiss for lack of personal jurisdiction, the court nonetheless

plaintiffs (including DC Compass) who purchased fractional shares of the Honeywell property from Dundee 53. The lawsuit generally alleges that third-party defendants Terzakis, Mulder, and Gardner engaged in a fraudulent scheme to acquire the Honeywell property via a complex arrangement involving various entities and to sell fractional fee interests to investors. CenterPoint was the owner of the building and represented to Messrs. Terzakis and Mulder and Ms. Gardner that a company called Invensys was about to enter into a ten-year lease for the building. Although the Invensys lease was not yet in place, they moved forward with the plan to buy the building. They created Dundee 53 to acquire the building, they created Master Dundee 53 to serve as the master tenant for the property, and they created Manager Dundee 53 to serve as the manager and operator of Dundee 53 and Master Dundee 53. They represented to potential investors that Invensys had a ten-year lease at the Honeywell property and also that investors would receive a guaranteed monthly rent payment for their proportionate share and that all expenses for the building would be paid. CenterPoint extended credit to Messrs. Terzakis and Mulder and Ms. Gardner so that they could purchase the property and, in exchange, Messrs. Terzakis and Mulder executed a $3.9 million promissory note. CenterPoint also entered into a lease by which it was obligated to pay nearly $1 million per month to Master Dundee 53 for space that was not leased at that time to other tenants. This lease included the space that investors had been told was leased to Invensys.

---

still finds that the third-party defendants are entitled to dismissal of the bank's claims against them. Accordingly, the court declines to resolve the third-party defendants' objections to the court's consideration of the allegations in the Chicago lawsuit.

In fact, Invensys never entered into a lease for space at the Honeywell property. Urban Investment Trust, Messrs. Terzakis and Mulder, and Ms. Gardner took money from Master Dundee 53's operating account and failed to pay real estate taxes, common area maintenance, insurance, and other expenses for the Honeywell property. They commingled funds with Urban Investment Trust's general operating account, and disbursed funds for their own personal use. The promissory note from Messrs. Terzakis and Mulder to CenterPoint came due on March 1, 2001, and approximately $1.1 million remained due and owing. Master Dundee 53 negotiated a lease buyout with CenterPoint of approximately $2.6 million. When the wire transfers took place, CenterPoint wired approximately $2.6 million to Chicago Title and Trust. Chicago Title and Trust, in turn, wired approximately $1.5 million to Urban Investment Trust and approximately $1.1 million to CenterPoint as consideration for the termination of the obligations of Messrs. Terzakis and Mulder under their note to CenterPoint. Messrs. Terzakis and Mulder and Ms. Gardner took the $1.5 million that was wired to Urban Investment Trust and used it for their own personal uses. Master Dundee 53 did not receive any of the money that it should have received under the lease termination agreement. Master Dundee 53 subsequently was unable to make the rental payments due to the fractional fee interest owners of the Honeywell property.

The court in Chicago appointed a receiver for the property. After a series of hearings, the court ordered Urban Investment Trust, Messrs. Terzakis and Mulder, and Ms. Gardner to turn over approximately $3.3 million to the receiver. They failed to do so and are being held in contempt of court and fined $2,500 per day until they comply with the court order. In an

effort to mitigate the plaintiffs' losses, the Honeywell property was sold with court approval. The plaintiffs received only a fraction of their original investment in the property.

The complaint in the Chicago lawsuit alleges several causes of action.  The bank relies on three of these claims to attempt to establish this court's jurisdiction over the third-party defendants.  One of these claims alleges fraud against Messrs. Terzakis and Mulder, Ms. Gardner, Urban Investment Trust, Manager Dundee 53, and Dundee 53 for representing that Invensys had a ten-year lease on the Honeywell property, a fraud which was allegedly perpetrated to induce investors to purchase fractional fee interests in the building.  Another claim alleges a conspiracy to defraud against these same defendants and CenterPoint for engaging in a conspiracy to sell the Honeywell property (the "Sale Conspiracy") so that CenterPoint could divest itself of the property, then Messrs. Terzakis and Mulder and Ms. Gardner could thereafter flip the property by selling fractional fee interests to investors by representing to investors that Invensys had a ten-year lease on the building.  Another claim alleges a conspiracy to interfere with the plaintiffs' contractual rights against these same defendants and Master Dundee 53 for engaging in a conspiracy to terminate CenterPoint's obligation to pay Master Dundee 53 and to provide capital to Urban Investment Trust (the "Lease Termination Conspiracy"), the result of which was that Master Dundee 53 was unable to fulfill its obligations to pay to the plaintiffs the real estate taxes and rent for the property.

The bank also has submitted a letter written to Mr. Campbell by David Foster, Director of Operations for TDS, regarding Mr. Campbell's interest in the § 1031 exchange opportunity. Attached to this letter is a confidentiality agreement that Mr. Campbell apparently executed

10

in order to receive information from Urban Investment Trust and/or TDS regarding his anticipated investment in the real estate. Also attached to the letter is information from TDS regarding the necessity that any purchase of the real estate be completed by a limited liability company.

The third-party defendants have now filed two motions to dismiss for lack of personal jurisdiction—one by CenterPoint and the second by Urban Investment Trust, Dundee 53, Master Dundee 53, Manager Dundee 53, Dundee, Inc., Dundee 53, Inc., TDS, Mr. Terzakis, and Ms. Gardner. The bank's argument in opposition to the motions to dismiss is that this court has jurisdiction because Urban Investment Trust and/or TDS contacted Mr. Campbell in Kansas to promote the § 1031 like-kind exchange and communicate the requirement that investors must establish limited liability companies to facilitate the exchange, and the court has jurisdiction over the other third-party defendants by virtue of the conspiracies which are the subject of the Chicago lawsuit.

### STANDARD FOR ESTABLISHING PERSONAL JURISDICTION

The moving third-party defendants have moved the court to dismiss the bank's claims against them for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). When jurisdiction is contested, the plaintiff has the burden of establishing personal jurisdiction over the defendant. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1074 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 1826 (2005). Where, as here, there has been no evidentiary hearing and the motion to dismiss for lack of personal jurisdiction is decided on the basis of affidavits and other

11

written materials, the plaintiff need only make a prima facie showing that jurisdiction exists. *Id*.   The plaintiff must show that jurisdiction exists under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *Id.* at 1075.

## DISCUSSION

"Because the Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process, [the court will] proceed directly to the constitutional issue." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090 (10th Cir. 1998) (quotation omitted); *accord Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994).[4]   Due process protects individuals and entities from being subject to binding judgments of a forum with which they have established no meaningful contacts, ties, or relations. *OMI Holdings, Inc.*, 149 F.3d at 1090 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985)).   Therefore, in order to satisfy the constitutional due process requirements "there must be 'minimum contacts' between the defendant and the forum state." *Bell Helicopter Textron, Inc. v. Heliqwest Int'l, Ltd.*, 385 F.3d 1291, 1295 (10th Cir. 2004).   The "minimum contacts" requirement "protects a defendant, who has no meaningful contact with a state, from the burdens of defending a

---

[4] The court does note, however, that if it were to find that the exercise of jurisdiction did not violate principles of due process, further consideration of the parties' arguments concerning the Kansas long arm statute might be warranted.

lawsuit far from home in a forum where the substantive and procedural laws may be quite different from those with which the litigant is familiar." *OMI Holdings, Inc.*, 149 F.3d at 1090. Additionally, it ensures that "'States, through their courts, do not reach out beyond the limits imposed by them by their status as coequal sovereigns in a federal system.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1979)).

This "minimum contacts" requirement may be met either (1) by continuous and systematic contacts with the forum state, in which case courts of that state have general jurisdiction over the defendant, and/or (2) by a defendant purposely directing activities at residents of the forum state, in which case courts of that state may exercise specific jurisdiction over the defendant "in cases that arise out of or relate to those activities." *Bell Helicopter Textron, Inc.*, 385 F.3d at 1295 (quotations omitted). In this case, the record submitted by the moving third-party defendants reveals that none of them has continuous and systematic contacts with Kansas such that this court could exercise general jurisdiction over them and the bank has provided no evidence from which the court can find to the contrary. The court therefore finds that it does not have general jurisdiction over any of the third-party defendants.

The court turns, then, to the issue of whether it may exercise specific jurisdiction over the third-party defendants. A specific jurisdiction analysis involves a two-step inquiry. *Benton*, 375 F.3d at 1075. First, the court considers whether "'the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).

"Second, if the defendant's actions create sufficient minimum contacts, we must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." *Id.* at 1075-76 (quotations omitted).

### 1. Minimum Contacts

In determining whether a defendant has established minimum contacts with the forum state, "there must be 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Bell Helicopter Textron*, 385 F.3d at 1296 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This requirement that the defendant purposefully avail itself of the privilege of conducting activities in the state "precludes personal jurisdiction as the result of 'random, fortuitous, or attenuated contacts.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "Purposeful availment requires actions by the Defendant which 'create a substantial connection with the forum state.'" *OMI Holdings*, 149 F.3d at 1092 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987)). Thus, the court "must determine whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from 'actions by the defendant *himself* that create a substantial connection with the forum state.'" *Id.* at 1091 (emphasis in original; citations omitted; citing *Burger King*, 471 U.S. at 472; quoting *Asahi*, 480 U.S. at 109). Thus, the court must examine the quantity and quality of the third-party defendants' contacts with Kansas to determine whether the assertion of this court's jurisdiction over these third-party defendants comports with due process.

14

The record reveals only two contacts between any of the third-party defendants and the state of Kansas with respect to the real estate transaction at issue.  First, Dundee 53 entered into the Purchase and Sale Agreement for the Honeywell property with DC Compass, which has its principal place of business in Kansas.  The bank, however, does not rely on this contact in arguing that third-party defendant Dundee 53 has minimum contacts with Kansas.  It is well established that "[a] contract between an out-of-state party and a resident of the forum state cannot, standing alone, establish sufficient minimum contacts with the forum."  *Benton*, 375 F.3d at 1077 (citing *Burger King*, 471 U.S. at 473).  Rather, in evaluating whether interstate contractual activities create the requisite minimum contacts the court must assess "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"  *Id.* (quoting *Burger King*, 471 U.S. at 479); *accord Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir. 1999).  Because the bank advances no further argument on this point, the court is unable to evaluate the nature of the parties' contractual relationship.  Thus, the court is presented with nothing more than a contract with a resident of the forum state, which is insufficient to establish minimum contacts with the forum.  Accordingly, the court finds that this contract does not establish sufficient minimum contacts with Dundee 53.

Second, the record reveals a contact with third-party defendant TDS, which sent a letter to Mr. Campbell in Manhattan.  This is the sole contact upon which the bank relies to establish personal jurisdiction over all of the third-party defendants.  The bank argues that the third-party defendants contacted Kansas to promote the § 1031 like-kind exchange, Urban Investment

15

Trust and/or TDS assisted investors in establishing limited liability companies to facilitate the like-kind exchanges, Urban Investment Trust and/or TDS communicated with plaintiffs by phone, letters, and e-mails directed into Kansas, and that these acts are imputed to all of the third-party defendants because they were done in furtherance of the conspiracies alleged in the Chicago lawsuit.   The bank's arguments, however, are largely unsupported by the record. Neither plaintiffs' complaint nor the bank's amended third-party complaint alleges that the third-party defendants contacted Kansas to promote the § 1031 like-kind exchange, nor do they allege that Urban Investment Trust and/or TDS assisted investors in establishing limited liability companies to facilitate the like-kind exchanges, nor do they allege that Urban Investment Trust and/or TDS directed communications to plaintiffs into Kansas.   The court also finds no such allegations in the pleadings in the Chicago lawsuit.   Rather, the only evidence in the record on this point is the copy of the letter sent from TDS to Mr. Campbell at an address in Manhattan, Kansas.   This letter explains that Mr. Foster (of TDS) "had the opportunity to talk with Royce Reed of Bank of America yesterday and *he asked me to send you* the following documentation for your 1031 Exchange."   (Emphasis added.)   The letter then describes the documents that are enclosed with the letter.   The letter concludes that "documentation regarding the necessity of your purchase as a LLC has been included.   This is a requirement of our lender and can easily be arranged by your attorney or ourselves."   The final page of the attachments to the letter contains an "Agreement" whereby the signer can request that TDS form a new limited liability company for the signer's ownership of replacement property.   This copy of the agreement is blank and is not executed.

16

This evidence fails to establish that TDS (much less Urban Investment Trust, for that matter) purposefully availed itself of the privilege of doing business in Kansas. Specific jurisdiction "must be based on actions by the defendant and not on events that are the result of unilateral actions taken by someone else." *Bell Helicopter Textron*, 385 F.3d at 1296. Although solicitation by the defendant is some evidence suggesting purposeful availment, *id.* at 1297, the record contains no evidence that TDS solicited business from Mr. Campbell. Rather, the correspondence reveals that TDS took action in response to the bank's request for information concerning the § 1031 exchange. In this respect, the Tenth Circuit case of *Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202 (10th Cir. 2001), is materially indistinguishable from the facts of this case. In *Doering*, the plaintiffs relied on solicitations from the defendant to establish specific jurisdiction. *Id.* at 1211. The defendant's vice president, however, attested in a sworn affidavit that the defendant did not send direct mailings to individuals located in the geographic area of the plaintiffs' residence in the absence of a request for information. *Id.* During the plaintiffs' first visit to the defendant's resort, they had "inquired about the possibility of purchasing real estate at the resort." *Id.* Following their visit, they began to receive direct mailings from the defendant advertising the purchase of real estate at the resort. *Id.* The Tenth Circuit held that the defendant's solicitation was "by no means sufficient to establish specific jurisdiction." *Id.* Likewise, here, the single solicitation by TDS apparently arose from the bank's request that TDS forward Mr. Campbell information concerning the potential investment. Because the impetus for this solicitation was a request by the bank, the court cannot find that TDS purposefully availed itself

17

of the privileges of conducting business in Kansas where TDS *itself* did not take any actions that created a substantial connection with Kansas. *See also, e.g.*, *Soma Med. Int'l*, 196 F.3d at 1299 (finding the plaintiff had not demonstrated that the defendant solicited the plaintiff's business where based on the record it was as likely that the two entered into a relationship because of the plaintiff's unilateral decision to select the defendant as its bank).

Given the bank's failure to establish the requisite minimum contacts between TDS and/or Urban Investment Trust, then, the bank's argument that this court should exercise personal jurisdiction over all of the third-party defendants by virtue of their fraudulent conspiracy with respect to the Honeywell property is equally without merit. The Tenth Circuit discussed the conspiracy theory of establishing personal jurisdiction over co-conspirators in *American Land Program, Inc. v. Bonaventura Uitgevers Maatschappij*, 710 F.2d 1449 (10th Cir. 1983). In that case, the Tenth Circuit stated that the issue before the court was "whether the acts of a nonresident conspirator, *which establish sufficient contacts with the forum state to make that conspirator amenable to service* . . . are likewise sufficient to establish personal jurisdiction over nonresident coconspirators." *Id.* at 1454 (emphasis added). The court noted that under the First Circuit case of *Glaros v. Perse*, 628 F.2d 679 (1st Cir. 1980), sustaining jurisdiction over an out-of-state co-conspirator requires "'something more than the presence of a co-conspirator within the forum state, such as substantial acts performed there in furtherance of the conspiracy and of which the out-of-state co-conspirator was or should have been aware.'" *Id.* (quoting *Glaros*, 628 F.2d at 682). In this case, then, the bank's reliance on the conspiracy theory of personal jurisdiction is misplaced for a number of reasons. First and

foremost, as previously discussed, the bank has failed to establish that any individual conspirator had sufficient contacts with the state of Kansas.   Thus, personal jurisdiction does not exist over any of the third-party defendants in order to create jurisdiction that can be imputed to the other third-party defendants.   Also, the bank has not established that "substantial acts" were performed in Kansas in furtherance of the conspiracy.   Additionally, the bank has not presented any allegations or affidavits from which it can be inferred that the out-of-state co-conspirators were or should have been aware of any substantial acts that were to be performed here in Kansas in furtherance of the conspiracy.[5]

Accordingly, the court finds that the bank has not met its burden of establishing that this court's exercise of jurisdiction over the third-party defendants would satisfy the due process principle that the defendant must have sufficient minimum contacts with the forum.

### 2.        Traditional Notions of Fair Play and Substantial Justice

---

[5] Although these grounds alone are sufficient to reject the bank's conspiracy theory of personal jurisdiction, the court also expresses doubts concerning the sufficiency of the evidence the bank has presented concerning the conspiracy. Even if the court accepts as true many of the factual allegations from the verified complaint from the Chicago lawsuit, the court is not necessarily persuaded that the allegations of conspiracy contained in that pleading (at least some of which do not appear to have been based on personal knowledge of the individual who verified the complaint) present a prima facie showing that the conspiracy actually existed, particularly when those conclusory allegations are weighed against CenterPoint's affidavit to the contrary. *See, e.g.*, *Am. Land Program, Inc.*, 710 F.2d at 1454 (defendants' affidavits that no conspiracy existed were sufficient to counter the plaintiff's allegations that a conspiracy existed); *Baldridge v. McPike, Inc.*, 466 F.2d 65, 68 (10th Cir. 1972) (same).

The court also finds that the bank has failed to establish that the exercise of personal jurisdiction over these third-party defendants would be consistent with traditional notions of fair play and substantial justice. In making this determination, the court must inquire "whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of the circumstances surrounding the case." *Benton*, 375 F.3d at 1078 (quotation omitted). In making this assessment, the court evaluates (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies. *Id.* The court's "minimum contacts" and "reasonableness" analyses are interrelated inasmuch as the weaker the plaintiff's showing of minimum contacts the less a defendant needs to show in terms of unreasonableness in order to defeat jurisdiction whereas, conversely, an especially strong showing of reasonableness may fortify a borderline showing of minimum contacts. *Id.*

The first factor the court must assess is the burden on the third-party defendants of litigating this case in Kansas. "[T]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *OMI Holdings, Inc.*, 149 F.3d at 1096. This factor "serves to prevent the filing of vexatious claims in a distant forum where the burden of appearing is onerous." *Id.* Here, this factor weighs against exercising personal jurisdiction over the third-party defendants. Other than the de minimus contacts discussed previously relating to the sale of the 2.85% fractional interest in

20

the Honeywell property to DC Compass, the third-party defendants do not have and appear never to have had any connection to the state of Kansas.   The third-party defendants are numerous and they are all essentially Illinois residents and entities.   Their conduct with respect to the Honeywell property is already the subject of litigation in Illinois.   To subject them to duplicative litigation in a foreign forum would be unduly burdensome.

Second, with respect to the forum state's interest in adjudicating the dispute, this factor also weighs against a finding that the exercise of personal jurisdiction over these third-party defendants is reasonable.   "States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors."   *Benton*, 375 F.3d at 1079 (quotation omitted).   "Although less compelling, a state may also have an interest in adjudicating a dispute between two non-residents where the defendant's conduct affects forum residents."   *OMI Holdings, Inc.*, 149 F.3d at 1096.   In this case, the bank is the entity seeking redress and it is not a Kansas resident.   The bank is a Delaware corporation with its principal place of business in North Carolina.   The only injured party with any connection to the state of Kansas is DC Compass.   Even then, although DC Compass has its principal place of business in Kansas, it is an Illinois limited liability company.   More importantly, though, although the third-party defendants' conduct allegedly injured DC Compass, DC Compass itself is already seeking redress from these third-party defendants in Illinois rather than in Kansas.   Thus, the state of Kansas has little, if any, interest in providing a forum for the bank, which is not a Kansas resident, to seek redress from the third-party defendants, all of which are out-of-state

21

actors, for the harm inflicted upon DC Compass, the only Kansas resident in this lawsuit, where DC Compass has already chosen to seek its own redress elsewhere.

> Third, evaluating the plaintiff's interest in convenient and effective relief
>
> hinges on whether the Plaintiff may receive convenient and effective relief in another forum. This factor may weigh heavily in cases where a plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit.

*Benton*, 375 F.3d at 1079 (quotation omitted). The bank has made no showing that it cannot receive effective relief in another court. It has not shown that its chances of recovery would be greatly diminished if it were forced to litigate in another forum (namely, Illinois). Certainly, though, it would probably be more convenient for the bank to litigate its indemnity claim against the third-party defendants in connection with plaintiffs' claim against the bank. But, the bank has not established that the burden of litigating its indemnity claim elsewhere would be so overwhelming as to practically foreclose pursuit of the lawsuit. Thus, the court is unpersuaded that this factor favors the reasonableness of the court's exercise of jurisdiction.

The fourth factor, which is the interstate judicial system's interest in obtaining efficient resolution of the parties' dispute, asks "whether the forum state is the most efficient place to litigate the dispute." *Id.* at 1080 (quotation omitted). "Key to the inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *Id.* (quotation omitted). This factor weighs heavily in favor of litigating the bank's claims against the third-party defendants in Illinois rather than in Kansas. The Honeywell property and the

third-party defendants' elaborate scheme to defraud investors is already the subject of litigation there.   The overwhelming bulk of witnesses and documents are undoubtedly located there and the wrong underlying the bank's indemnity claim occurred there.   The court is unpersuaded by the bank's arguments that it would be more efficient to deal with the plaintiffs' claim against the bank in conjunction with the bank's related claim for indemnity against the third-party defendants, and that the bank's indemnity claim involves numerous defendants such that hardship and inefficiency would ensue if the bank were forced to adjudicate those claims in separate forums.   Piecemeal litigation will result whether the bank litigates its claims against the third-party defendants here or in Illinois.   In fact, the bank has sought to stay the third-party aspect of this case until the litigation is concluded in Chicago, arguing that it would be a waste of resources to pursue its indemnity claim in the absence of a judgment in the Cook County action.   Thus, it does not appear that the interstate judicial system's interest in obtaining efficient resolution of the parties' dispute would be furthered at all by allowing this aspect of this lawsuit to sit dormant until the Chicago lawsuit is resolved.   Accordingly, the factor weighs heavily against the court exercising jurisdiction.   *See, e.g.*, *OMI Holdings, Inc.*, 149 F.3d at 1097 (concluding that litigating dispute in Kansas would not be more efficient than in Canada where witnesses were largely located in Canada and states other than Kansas and the plaintiff could have joined all of the insurance companies in Canada).

Lastly, "[t]he fifth factor of the reasonableness inquiry focuses on whether the exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign nations." *Benton*, 375 F.3d at 1080 (brackets in original; quotation omitted).

23

In this case, the parties have not directed the court's attention to any substantive social policy that might be implicated by the court's exercise of jurisdiction.   Accordingly, this factor is neutral.

On balance, in light of the extremely limited nature of the contacts between the third-party defendants and Kansas, the court finds that exercising jurisdiction over the bank's indemnity claim against them would be so unreasonable that it would offend traditional notions of fair play and substantial justice.   Allowing this claim to proceed here would be an inconvenience to everyone involved in this litigation.   The only party with any connection to the state of Kansas is DC Compass, for which Kansas is its principal place of business and, even then, DC Compass is an Illinois limited liability company.   The contacts upon which the bank relies to attempt to establish personal jurisdiction over the third-party defendants are contacts between the third-party defendants and the plaintiffs, yet the plaintiffs have chosen to pursue redress from the third-party defendants in Illinois.   In light of the circumstances surrounding this case, the court cannot find that the exercise of jurisdiction over the third-party defendants would be reasonable.

## CONCLUSION

In conclusion, the court finds that based on the record the bank has not met its burden of establishing that exercising jurisdiction over the third-party defendants would comport with due process principles.   In so holding, the court is certainly aware that the plaintiff's burden of proving that jurisdiction exists in the preliminary stages of litigation is light.   *Wenz v.*

24

*Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  The court is also mindful of the fact that the bank's contacts with the third-party defendants in attempting to facilitate the plaintiffs' § 1031 like-kind exchange may have had more of a connection to the state of Kansas than is revealed by the record currently before the court.  But, the bank has presented no allegations or affidavits to establish that the third-party defendants had or have any meaningful contacts, ties, or relations to the state of Kansas.  Absent more meaningful evidence on this issue, then, the court is unable to find that the third-party defendants have the type or degree of contacts with the state of Kansas that would satisfy constitutional due process requirements.

**IT IS THEREFORE ORDERED BY THE COURT** that the third-party defendants' motions to dismiss the bank's amended third-party complaint for lack of personal jurisdiction (docs. 66 & 77) are granted.

**IT IS SO ORDERED** this 22nd day of December, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge